IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IAN D. DONALDSON and | : | 10-cv-1556 |
| MEGAN DONALDSON | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| NORFOLK SOUTHERN RAILWAY, CO., | : | |
| and NORFOLK SOUTHERN CO., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

August 15, 2011

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

Presently before the Court is Plaintiff Ian D. Donaldson and Megan Donaldson's Motion for Summary Judgment, (Doc. 26), and Defendant Norfolk Southern Railway Company and Norfolk Southern Corporation's cross Motion for Summary Judgment.  (Doc. 32).  For the reasons set forth below, Plaintiffs' motion shall be denied and Defendants' motion shall be granted.

## I.    PROCEDURAL HISTORY and FACTUAL BACKGROUND

Due to the familiarity of the parties and this Court with the record, we herein set forth a number of material facts supplemented as necessary by additional facts throughout our analysis and disposition of the pending motions.

Plaintiffs Ian Donaldson ("Ian") and his wife Megan Donaldson ("Megan") (collectively "Plaintiffs") were employed by Norfolk Southern Railway ("NSR") during the time of the alleged incidents.  Norfolk Southern Corporation ("NSC"), a Virginia corporation, is a national transportation company engaged in the business of hauling freight by rail through its subsidiary NSR.  (Doc. 1 ¶¶ 7, 8).  Ian was hired by NSR to work as a conductor in the Enola Yard on February 8, 2007.  (Doc. 1 ¶ 16).  On February 11, 2008, Megan, who was engaged to Ian, was hired by NSR as a train dispatcher in the Harrisburg Office.  (*Id*. ¶ 17).

In April of 2008, Ian and Megan allege they began experiencing harassment when sexually explicit graffiti was written about Megan in the Enola Yard, where Ian worked.  (*Id*. ¶ 18).  Plaintiffs allege that some of the graffiti described illicit sexual activity between Megan and her boss, the Assistant Division Superintendent.  (*Id*.).  Ian contends that he reported the sexually explicit and offensive graffiti to his supervisor on April 5, 2008, but that sexually explicit graffiti was again written about Megan at the Enola Yard.  (*Id*. ¶ 19).  Defendants claim that Jeff Moore ("Moore"), the Enola Yard Terminal Superintendent, immediately contacted higher management to inform them of the situation and issued a bulletin the same day reiterating NSR's policy concerning all types of harassment.  (Doc. 33 ¶¶ 35-36).  In addition to instructing Ian that he should

report any further incidents of graffiti to management for investigation, NSR

directed Gary Petrewicz ("Petrewicz"), local chairman for the UTU, to talk to

UTU members and instruct them to stop writing graffiti, which he did.  (*Id*. ¶¶ 33-

34).

After graffiti appeared a second time, on May 12, 2008, Ian again reported

the incident to management.  (Doc. 1 ¶ 20).  In response, Moore contacted higher

management including Ben Fennell ("Fennell"), the Assistant General Manager

for the Northern Region, and Don Craine ("Craine"), the Assistant Division

Superintendent, as well as NSR's EEO Department who subsequently commenced

a formal investigation.  (Doc. 33 ¶ 41).  NSR's internal investigation involved

interviewing all west end crews who used the office close to the graffiti, and

notifying Norfolk Southern Police about the incident.  (*Id*. ¶ 42).  Defendants

claim that on May 19, 2008, less than one week after the second occurrence of

graffiti was reported, NSR painted over the graffiti and was completing interviews

of the west end crews.  (*Id*. at 43).  Handwritten samples were also taken from the

twelve (12) individuals who were interviewed about the graffiti, and those samples

were forwarded to Debra Seibert ("Seibert") in NSR's EEO Department on June

19, 2008, who then forwarded the samples to an independent handwriting expert,

Cina Wong, ("Wong"), for analysis.  (*Id*. ¶¶ 44-45).

Following the third instance of sexually explicit and offensive graffiti, and another report of the incident to management on July 11, 2008, Moore photographed the graffiti and forwarded the same to Seibert in NSR's EEO Department for inclusion in the already existing file sent to Wong. (*Id*. ¶ 47). On August 4, 2008, Moore issued another bulletin emphasizing NSR's EEO policy regarding harassment to all employees at the Enola Yard. (*Id*. ¶ 48). Furthermore, following Wong's analysis of the handwriting samples and photographs, a report was issued that resulted in five individuals being accused as the parties responsible for the graffiti. (*Id*. ¶ 49). The five coworkers identified by Wong included Shawn Cox, Jason St. Clair, Michael Whisinnand, Jack Hurley, and Ryan Maulfair. (*Id*. 33 ¶ 50). Subsequently, on October 3, 2008, these individuals were charged with "conduct unbecoming an employee; defacing company property and engaging in harassment. . . ." (*Id*. ¶ 51). A hearing on this matter was rescheduled numerous times and eventually took place on March 11, 2009. (*Id*. ¶¶ 51-55).

Prior to the hearing, Ian and Megan both filed individual Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 9, 2009, who referred the matter to the Pennsylvania Human

4

Relations Commission ("PHRC") for dual filing.  (Doc.. ¶¶ 9, 10).[1]  Subsequently,

formal notice of Plaintiffs' EEOC complaints was provided to Defendants on

March 3, 2009.  (Doc. 27 ¶ 42).  In early March, Ian reported another incident of

graffiti to Moore, but noted that he was unsure how long it had been present.  (*Id*.¶

¶ 56-57).  Before the end of the day on March 11, 2009, NSR photographed and

painted over the graffiti.  (*Id*. ¶ 58).  NSR disciplined the five employees identified

by Wong with a "30 days deferred" suspension, akin to a probationary period,

meaning that if the employee were to receive disciplinary action within a given

period of time, the employee would be suspended for 30 days.  (Doc. 37 ¶ 46).

Ian contends that NSR's investigation into the matter was not conducted in

a confidential manner and consequently, in the summer of 2008, he began

experiencing retaliation by co-workers and supervisors at NSR.  (Doc. 1 ¶ 22).  He

alleges that these individuals ostracized him, verbally and physically threatened

him, and physically attacked him for reporting the harassment he experienced.

(*Id*.).  In addition, Ian claims he experienced retaliation when he was suspended

twice without pay on the basis of groundless reports regarding his work conduct

---

[1]  Ian's claim was docketed as charge number 530-2009-01807, and Megan's claim was docketed as charge number 530-2009-01808.  (Doc. 1 ¶¶ 9,10).

which were fabricated by co-workers in retaliation for his reporting of the sexually

explicit graffiti.  (*Id*. ¶ 23).

On April 9, 2010, the PHRC closed Megan's case administratively, and on

May 12, 2010, the PHRC closed Ian's case administratively.  (Doc. 1 ¶¶ 11, 12).

Ian and Megan both received notice of their right to sue in federal court on July 1,

2010.  (*Id*. ¶¶ 13, 14).  Plaintiffs contend they satisfied all administrative

prerequisites necessary to bring suit in federal court, and therefore they filed the

instant complaint on July 27, 2010 alleging five counts of discrimination pursuant

to Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations

Act.[2] (Doc. 1).  Defendants filed a Motion to Dismiss Counts IV and V of

Plaintiffs' Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) on

September 27, 2010.  (Doc. 8).  Thereafter, on January 1, 2011, we issued a

Memorandum and Order denying Defendants' motion to dismiss.  (Doc. 20).

On May 23, 2011, Plaintiffs filed a Motion for Summary Judgment, (Doc.

26), and a brief in support thereof.  (Doc. 28).  Defendants filed an opposition

---

[2] The complaint lodges the following claims of discrimination against Defendants: Count I- Title VII Violations, Sexual Discrimination and Harassment (Ian Donaldson v. Defendants); Count II- Title VII Violations, Retaliation (Ian Donaldson v. Defendants); Count III- PHRA Violations, Sexual Discrimination and Harassment (Ian Donaldson v. Defendants); Count IV- Title VII Violations, Sexual Discrimination and Harassment (Megan Donaldson v. Defendants); and Count V- PHRA Violations, Sexual Discrimination and Harassment (Megan Donaldson v. Defendants).  (*See* Doc. 1).

brief on June 16, 2011.  (Doc. 38).  NSR and NSC filed their own cross Motion for

Summary Judgment, (Doc. 32), and brief in support thereof, (Doc. 35), on June 1,

2011.  Plaintiffs filed a brief in opposition on June 22, 2011, (Doc. 40), and

Defendants filed a reply brief in further support of their motion on July 8, 2011.

(Doc. 42).  Therefore, the motions have been fully briefed and are ripe for

disposition.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(c).  Initially, the moving party bears the

burden of demonstrating the absence of a genuine issue of material fact.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant meets this burden by

pointing to an absence of evidence supporting an essential element as to which the

non-moving party will bear the burden of proof at trial.  *Id.* at 325.  Once the

moving party meets its burden, the burden then shifts to the non-moving party to

show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e)(2).  An issue is

"genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find

for the non-moving party, and a factual dispute is "material" only if it might affect

the outcome of the action under the governing law.  *Anderson v. Liberty Lobby,*

*Inc*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely

on allegations of denials in its own pleadings; rather, its response must ... set out

specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The

non-moving party "cannot rely on unsupported allegations, but must go beyond

pleadings and provide some evidence that would show that there exists a genuine

issue for trial."  *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).

Arguments made in briefs "are not evidence and cannot by themselves create a

factual dispute sufficient to defeat a summary judgment motion."  *Jersey Cent.*

*Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

However, the facts and all reasonable inferences drawn therefrom must be viewed

in the light most favorable to the non- moving party.  *P.N. v. Clementon Bd. of*

*Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement

about the facts or the proper inferences that a factfinder could draw from them.

*Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).  Still,

"the mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; there must

be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson*,

477 U.S. at 247-48.

## III.   DISCUSSION

### A.   Count I, III, IV & V:  Hostile Work Environment Claim

Plaintiffs' motion and Defendants' motion both move for summary

judgment on Plaintiffs' hostile work environment claims pursuant to Title VII.[3]

Plaintiffs note that the Third Circuit's decision in *Andreoli v. Gates* requires a

plaintiff to establish that:  "(1) the employee suffered intentional discrimination

because of her sex, (2) the discrimination was pervasive and regular, (3) the

discrimination detrimentally affected the employee, (4) the discrimination would

detrimentally affect a reasonable person of the same sex in that position, and (5)

the existence of respondeat superior liability."  (Doc. 28 at 14 (citing *Andreoli v.*

*Gates*, 482 F.3d at 643)).

Under the first element, Plaintiffs assert it is undisputed that they were the

subjects of sexually explicit graffiti in their workplace that described illicit sexual

---

[3]  Plaintiffs and Defendants also move for summary judgment on Plaintiffs' hostile work environment claims to the extent this cause of action is based on the Pennsylvania Human Relations Act, ("PHRA"), 42 P.S. § 951, *et seq*.  As we have previously noted, since the PHRA and Title VII share the same precedent, our analysis of the summary judgment motion under Title VII shall also apply to Plaintiffs' PHRA claims.  (Doc. 20 at 12 (citing *Dici v. Pennsylvania*, 91 F.3d 542, 553 (3d Cir. 1996) (nothing that "[g]enerally, the PHRA is applied in accordance with Title VII."))).

conduct between Plaintiffs and between Plaintiffs and other third parties.  (*Id*. at 15).  They argue that the graffiti targeted Plaintiffs based on their respective female and male genders.  (*Id*. at 16).  Plaintiffs cite *Andrews v. Philadelphia* for the proposition that "the intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course."  (Doc. 41 at 11 (citing 895 F.2d 1469, 1482 (3d Cir. 1990))).  They contend that the graffiti at issue here was designed to harass, intimidate, and humiliate Ian and Megan based on their respective genders.  (*Id*. at 12 (citing *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21-22 (1993) ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."))).

As to the second element, the pervasiveness and regularity of the discrimination, Plaintiffs contend that the sexually explicit and offensive graffiti began in April of 2008 and continued throughout Megan's employment with NSR.  (Doc. 1 ¶ 39).  Moreover, they claim that because this Court found such facts to sufficiently allege the pervasive and regular element at the motion to dismiss

stage, that the same facts adequately support this element in granting Plaintiffs'

summary judgment motion.

Concerning the third element, the detrimental affect of the discrimination on

the employee, Plaintiffs claim it is undisputed that they had actual knowledge of

the sexually explicit graffiti about them.  (Doc. 28 at 17).  Furthermore, they

maintain it is undisputed that Plaintiffs' coworkers at NSC observed the sexually

explicit graffiti as well.  (*Id*.).  Plaintiffs argue it is also undisputed that Megan

experienced embarrassment, emotional feelings, and stress as a result of the

sexually explicit graffiti and from interacting with her supervisors, among them

Mr. Martinez, who were also aware of the graffiti.  (*Id*. at 18).  In addition,

Plaintiffs claim it is undisputed that Ian experienced stress in his personal

relationship with Megan as a result of the graffiti.  (*Id*.).

Under the fourth element, whether the discrimination would detrimentally

affect a reasonable person of the same gender, Plaintiffs argue it is undisputed that

they were subjected to at least three (3) separate instances of sexually explicit

graffiti between early 2008 and the summer of 2009.  (*Id*. at 19).  They also claim

it is undisputed that the graffiti was severe based on its inherent content.  (*Id*.).

Finally as to the fifth element, the existence of respondeat superior liability,

Plaintiffs argue it is undisputed that the five (5) individuals responsible for

authoring the sexually explicit graffiti were NSR[4] employees.  They also claim that

management-level employees had actual knowledge of the sexually explicit

graffiti.  (*Id.*).  Plaintiffs assert that despite Ian reporting the graffiti to

management employees and his union representative, the graffiti continued to

appear.  They also contend that NSC did not commence an informal EEO

complaint concerning the graffiti until Ian reported additional instances of

sexually explicit graffiti.  Moreover, Plaintiffs maintain, the graffiti itself was not

properly or timely removed and remained on the property for over six (6) months.

(Doc. 28 at 20).

    In response, Defendants contend that Ian and Megan fail to offer any

evidence in support of their motion other than conclusory statements.  (Doc. 38 at

7).  Concerning the first element, discrimination because of Plaintiffs' gender,

Defendants argue it is not the gender of the victim or source of the alleged

harassment that is critical to a sexual harassment claim, but rather the victim must

prove that "the conduct at issue was not merely tinged with offensive sexual

---

    [4] While Plaintiffs' complaint noted that they were both employed by NSR, a subsidiary of NSC, (*see* Doc. 1 ¶¶ 16-17), their Statement of Material and Undisputed Facts claims that both were employees of NSC.  (Doc. 27 ¶¶ 1-2).  However, Defendants note in their Counter Statement of Undisputed Material Facts In Opposition to Plaintiffs' Motion for Summary Judgment that NSR previously admitted that it, not NSC, employed both Plaintiffs.  (Doc. 37 n.2).  As we have granted Defendants' motion for summary judgment, we find it unnecessary to address the parties' arguments regarding Plaintiffs' employment by either NSR, NSC, or both.

connotations, but actually constituted 'discrimination . . . because of . . . sex.'"

(Doc. 35 at 14 (citing *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81

(1998))).  Defendants highlight the Third Circuit's decision in *Bibby v.*

*Philadelphia Coca Cola Bottling Company* which discussed the three ways a

plaintiff could prove same-sex harassment:

> there are several situations in which same-sex harassment can be seen
> as discrimination because of sex.  The first is where there is evidence
> that the harasser sexually desires the victim. . . . Same-sex harassment
> might also be found where there is no sexual attraction but where the
> harasser displays hostility to the presence of a particular sex in the
> workplace. . . .  Further, although it is less clear, a plaintiff may be able
> to prove that the same-sex harassment was discrimination because of sex
> by presenting evidence that the harasser's conduct was motivated by a
> belief that the victim did not conform to the stereotypes of his or her
> gender.

(*Id*. at 15 (citing 260 F.3d 257, 262 (3d Cir. 2001))).

Applying *Bibby*, Defendants maintain, Plaintiffs have provided no evidence

to infer that the sexually explicit graffiti was written in order to sexually harass or

discriminate against Ian for any of the three reasons outlined above.  (Doc. 35 at

16).  In particular, Defendants emphasize Ian's deposition in which he testified to

his belief regarding the cause of the graffiti as follows:

> **Q:**    Why do you think your coworkers were writing this graffiti
> about you?
> **A:**    Because I had a pretty girlfriend at the time.  I was very – I
> don't know – proud.  I really couldn't tell you.  I drove a nice

13

> car, had a pretty girlfriend.  I was making – I was doing well at
> work.  I don't know.  People didn't like that.
>
> **Q:**   So they were jealous?
> **A:**   I would assume. . . .

(Doc. 34 Ex. A-1 at 89:25-90:9).

Defendants further claim that Ian testified that the content of the grafitti was

not true and to his knowledge, no one at NSR believed it to be true.  (Doc. 35 at

17).  They also cite the deposition testimony of Ian's coworkers who stated that

the graffiti was jocular in nature.  (*Id*. (citing Doc. 34 Ex. A-8 at 13:23-14:5; Ex.

A-6 at 38:5-38:17)).  Defendants contend that Ian's coworkers may have posted

graffiti about him out of animosity, because a few coworkers testified that Ian had

a reputation for being cocky, a trouble-maker, and having a bad mouth.  (*Id*. at 18

(citing Doc. 34 Ex. A-8 at 43:22-24; Ex. A-7 at 78:17-80:3; Ex. A-5 at 26:5-25)).

Additionally, Defendants cite a slew of cases highlighting that while

comments or conduct directed toward a coworker may contain vulgar sexual

content or connotations, such actions, without more, do not rise to the level of

discrimination on the basis of sex that would benefit from protection under Title

VII.  (*Id*. at 18-19 (citing *Davis v. Coastal Int'l Security, Inc.*, 275 F.3d 1119, 1126

(D.C. Cir. 2002) ("We find only that however vulgar [Mr.] Smith's and [Mr.]

Allen's behavior [when they grabbed his crotch, made kissing gestures, and used a

phrase describing oral sex], no reasonably jury could believe that it constitutes

discrimination [against Mr. Davis] because of sex.  To conclude otherwise on the

facts of this case would trivialize the important values protected by Title VII and

elevate a gross workplace dispute into a federal case."); *Vandeventer v. Wabash*

*Nat'l Corp.*, 887 F.Sup. 1178, 1181 n.2 (N.D. Ind. 1995) ("while the epithet used

[dick sucker] and the taunting had a 'sexual' component, as do most expletives,

the crucial point is that the 'harasser' was not aiming expletives at the victim

because of the victim's maleness."))).  Thus, Defendants maintain, Ian's claims

concerning the facially sexual content of the graffiti are insufficient to prove that

vulgar comments were directed toward him because of his gender.

As to Megan's claim, Defendants argue that Plaintiffs fail to present

evidence demonstrating that the discrimination Megan suffered was a result of her

gender.  (Doc. 35 at 33 (citing *Oncale*, 523 U.S. at 78 (noting that a plaintiff

alleging a sexual harassment claim "must always prove that the conduct at issue

was not merely tinged with offensive sexual connotations, but actually constituted

discrimination because of sex")))).  In particular, Defendants contend, Megan

testified during her deposition that she believed the likely motivation behind the

graffiti was to make Ian angry.  (*Id*. at 34 (citing Doc. 34 Ex. A-2 at 45:14-16, 20-

23)).  Again, Defendants argue that Megan fails to prove that the graffiti discriminated against her simply because of her gender.

Regarding the second element, the pervasiveness and regularity of the harassment, Defendants challenge Plaintiffs' supposition that because the Court found that the graffiti "*could* alter the terms and conditions of employment" in ruling on the motion to dismiss, that the same ruling conclusively establishes the second element for purposes of summary judgment.  (Doc. 38 at 9) (emphasis added).  Defendants maintain that Plaintiffs are conflating the plausibility standard courts apply in analyzing a 12(b)(6) motion to dismiss, with the absence of a genuine issue of material fact standard on summary judgment.  They contend that since discovery closed, Plaintiffs fail to offer any evidence that the graffiti referencing Megan was severe or pervasive.  (*Id*.).  Defendants emphasize that although Megan knew of a single incident of graffiti describing an illicit sexual relationship between her and her supervisor, Mr. Martinez, she never saw the graffiti herself.  Thus, they argue, Plaintiffs' claim that Megan was subjected to at least three instances of graffiti lacks merit.

Moreover, while Defendants admit that graffiti of all types is common at NSR, they claim that the graffiti at issue here was not sufficiently severe to alter the terms and conditions of Ian's employment.  (*Id*. at 10).  Defendants note that

16

the Supreme Court has instructed that "simple teasing, offhand comments, and
[non-serious] isolated incidents . . . would not amount to discriminatory changes in
the terms and conditions of employment." (*Id.* (citing *Abramson v. William
Paterson College*, 260 F.3d 265, 280 (3d Cir. 2001))). Furthermore, Defendants
argue that Ian fails to provide evidence that the graffiti was so severe that it
intended to, or actually did, alter the terms or conditions of his employment.

As to Megan, Defendants claim that Plaintiffs fail to provide evidence that
the alleged harassment was pervasive or regular. Defendants highlight the
Supreme Court's decision in *Faragher v. City of Boca Raton* where the Court
noted that in determining whether harassment was severe or pervasive courts must
consider "the frequency of the discriminatory conduct; its severity; whether it is
physically threatening or humiliating or a mere offensive utterance; and whether it
unreasonably interferes with the employee's work performance." 524 U.S. 775,
787-88 (1998). They also contend the Third Circuit has held that humiliating
comments, in and of themselves, do not constitute severe or pervasive harassment.
(Doc. 35 at 36 (citing *Hamera v. County of Berks*, No. 06-3518, 2007 WL
2745772, *3 (3d Cir. 2007))). Defendants claim Megan testified she was only
made aware of one instance of harassment by Ian, which alleged that she was
having an illicit sexual relationship with her boss, Mr. Martinez. (*Id.* at 38).

17

Significantly, Defendants assert, Megan never saw any photos of the graffiti, talked to coworkers or supervisors about the graffiti, or heard anyone else discuss the graffiti other than Ian. (*Id*. at 38-39). Additionally, Defendants note that in *E.G. Austin v. Norfolk Southern Corporation*, the Third Circuit held that three instances of vulgar graffiti, one of which occurred on Norfolk Southern property, did not constitute severe or pervasive discrimination sufficient to support a cause of action for sexual harassment. (*Id*. at 39 (citing *E.G. Austin v. Norfolk Southern Corporation*, No. 04-1568, 2005 U.S. App. LEXIS 27298, at *8-9 (3d Cir. Dec. 14, 2005))). Thus, Defendants assert Megan has not proven that the one instance of graffiti which she was aware of was so severe and pervasive that it altered the terms and conditions of her employment. (*Id*. at 40).

As to the third element, the detrimental affect of the discrimination on the employee, Defendants contend that although Megan alleges she was embarrassed, emotional, and suffered stress from her knowledge of the graffiti, none of the record evidence supports this conclusion. (*Id*. at 12). They also assert that Plaintiffs fail to present evidence suggesting Ian suffered any detrimental affects as a result of the graffiti. (*Id*.). Defendants maintain that the evidence produced merely demonstrates that graffiti of all types is common in train yards, that graffiti is a form of "jocularity" among male conductors who work in train yards, and that

Ian was not only subject to graffiti but admitted authoring graffiti about fellow employees.  (*Id*. at 12-13).

In addition, Defendants assert, Megan fails to demonstrate that the discrimination detrimentally affected her.  (Doc. 35 at 40).  To support this argument, Defendants highlight a portion of Megan's deposition testimony wherein she testified as follows:

> **Q:**  Did the graffiti, itself, did that interfere with your ability to perform your job as a train dispatcher?
> **A:**  No.
> **Q:**  And the graffiti didn't interfere with your ability to succeed in becoming qualified on the various territories as a train dispatcher?
> **A:**  No.

(Doc. 35 at 42 (citing Doc. 35 A-2 at 76:24-77:6)).  Moreover, Defendants argue Megan's claims that she was humiliated or embarrassed are insufficient to constitute a detrimental affect because such feelings fail to show that the alleged discrimination unreasonably interfered with her work performance.  (Doc. 35 at 42 (citing *Harris*, 510 U.S. at 22-23)).

Regarding the fourth element, whether a reasonable person would be detrimentally affected by the discrimination, Defendants assert that the evidence actually establishes that a reasonable train conductor in Ian's position would not have been detrimentally affected given the prevalence of teasing and "jocularity,"

19

albeit crude and vulgar, in train yards.  (Doc. 38 at 13 ).  In support of this

assertion, Defendants cite the deposition testimony of Stewart McGarvey who

stated "[t]here's not just graffiti about Ian, there's graffiti about other people . . . ."

and "if a train goes by, almost every car has graffiti on it."  (*Id*. (citing Doc. 34 Ex.

A-7 at 24:22-25:3; 27:9-11)).  They note that Petrewicz also remarked, "guys have

been writing [graffiti] about each other as long as I'm on the railroad . . . I've been

on the walls."  (*Id*. (citing Doc. 34 Ex. A-6 at 38:12-15))

As to Megan, Defendants claim that her knowledge of a single incident of

graffiti at a location several miles from her place of work, which she only learned

of through her fiancé, would not lead a reasonable woman in her position to be

detrimentally affected.  (Doc. 35 at 44).  They contend that under the

circumstances the graffiti at issue constitutes nothing more than an offensive

utterance and would not produce a detrimental affect.  (*Id*.).

As to the fifth element, Defendants claim that Plaintiffs fail to provide

sufficient evidence to establish respondeat superior liability.  (Doc. 38 at 20).

They cite the Third Circuit's decision in *Griffin v. Harrisburg Property Services,*

*Incorporated* for the proposition that "where the harasser is a co-worker, the

employer is not automatically liable [;] . . . employer liability attaches only if the

employer failed to provide a reasonable avenue for complaint, or, alternatively, if

the employer knew or should have known of the harassment and failed to take

prompt and appropriate remedial action." 2011 LEXIS 7011, at *9 (3d Cir., Apr.

4, 2011).  Defendants further contend that an employer will only be held

vicariously liable for the alleged discrimination if the person charged with creating

the hostile work environment is the plaintiff's supervisor.  (Doc. 35 at 21 (citing

*Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 150 (3d Cir. 1999))).  Moreover,

they maintain, the Third Circuit in *Andrews v. City of Philadelphia* noted that "the

limited ability of employees to direct the work of crews or other small groups of

workers does not equate to a supervisory position for purposes of imputing

liability to the employer." 895 F.2d 1469, 1482 (3d Cir. 1990).  Defendants claim

that according to the *Griffin* court "an employee's knowledge could be imputed [to

the employer] where the employee is sufficiently senior in the employer's

governing hierarchy, or otherwise in a position of administrative responsibility

over employees under him, such as a departmental or plant manager, so that such

knowledge is important to the employee's general management duties." *Griffin*,

2011 LEXIS 7011 at *12.

Here, Defendants argue that because Ian's coworkers, not supervisors,

authored the graffiti at issue, NSR cannot be held vicariously liable on this claim.

(Doc. 35 at 22).  They assert that according to the court in *Griffin* "when the

harasser is a co-worker, employer liability attaches 'only if the employer fails to provide a reasonable avenue for complaint, or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action.'" *Griffin*, 2011 LEXIS 7011 at 10.  As to the former, a reasonable avenue for complaint, Defendants claim that Ian reported the graffiti to NSR through procedures established pursuant to its EEO policy.  (Doc. 35 at 22). Thus, Defendants argue that the latter inquiry, whether NSR took prompt and appropriate remedial action, is the only question this Court needs to address.  (*Id*.). Defendants cite *Andreoli v. Gates* for the proposition that the timing and nature of an employer's response will determine whether the remedial action was "reasonably calculated to end the harassment."  482 F.3d at 644.

In particular, Defendants argue that NSR responded promptly to each of Ian's reports concerning the graffiti.  They claim despite the fact no one was disciplined immediately after Ian's reports, the parties acknowledged that the graffiti was anonymous and required an internal investigation in order to determine the source of the graffiti.  (*Id*. at 23).  Defendants contend that Plaintiffs fail to explain how NSR's actions were not prompt or appropriate under the circumstances.

22

Regarding Ian's first complaint about the graffiti, Defendants contend they immediately removed the graffiti, contacted upper level manager, reiterated via bulletin NSR's EEO policy concerning harassment, interviewed crews working nearby the graffiti, and directed Petrewicz to instruct all union members to stop writing graffiti.  (Doc. 35 at 26-27).  As a result, Defendants highlight, Ian followed up with Moore and informed him that he was satisfied with the remedial action taken, that it had the desired effect, and that he did not wish to press the issue further.  (*Id.*).

Following Ian's second report of graffiti on May 12, 2008, Defendants claim that Moore reported the issue to management, interviewed the west end crews, notified the Norfolk Southern Police, painted over the graffiti, and commenced a formal internal investigation.  (*Id.* at 27-28).  Specifically, NSR painted over the graffiti on May 19, 2008 and interviewed twelve individuals concerning the graffiti between May 12, 2008 and June 18, 2008.  (*Id.*). Defendants assert that on June 19, 2008, handwriting samples were forwarded to Cina Wong, a handwriting expert, for analysis.

After graffiti was discovered a third time on July 11, 2008, Defendants claim that Moore photographed the graffiti, forwarded the images to NSR's EEO Department to be added to the file for Wong to analyze, and issued another

bulletin to NSR employees emphasizing the company EEO policy and stressing compliance with it. (*Id*. at 28-29). Defendants highlight that the individuals identified by Wong's report were charged with "conduct unbecoming an employee; defacing company property and engaging in harassment. . . ." (*Id*.). In addition, although a hearing was initially scheduled for the week of October 10, 2008, Petrewicz, the union representative for the five suspects, requested that the hearing be postponed numerous times due to preplanned vacations arranged by the five employees and other scheduling conflicts. Thus, Defendants argue, any delay in conducting the hearing for these individuals was not the fault of NSR.

Following a fourth incident of graffiti, reported on March 11, 2009, NSR photographed the graffiti and painted over it the same day. One of two NSR employees interviewed about the graffiti recalled observing it in 2008. (*Id*. at 29-30). Consequently, Defendants contend, Moore conducted several special EEO training sessions addressing the graffiti. NSR also held an investigative hearing on March 11, 2009 for the five suspects, and each was assessed thirty (30) days deferred suspension as noted above. (*Id*.). In sum, Defendants contend they took prompt action reasonably calculated to prevent further harassment. We agree with Defendants.

After extensive review of the record and applicable law, we find that Plaintiffs fail to offer any evidence beyond mere conclusory, self-serving statements to support their hostile work environment claim. *See Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000) (noting that the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial."). Concerning the first element of Plaintiffs' hostile work environment claim, intentional discrimination because of sex, we find that although Plaintiffs allege that the graffiti described sexually explicit conduct between Plaintiffs and between Plaintiffs and other third parties, they have failed to demonstrate that they were the targets of such discrimination because of their respective genders. As the Supreme Court stated in *Oncale v. Sundowner Offshore Services, Incorporated*, a victim claiming sexual harassment must prove that "the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination . . . because of . . . sex.'" 523 U.S. 75, 81 (1998).

In addition, we find that Plaintiffs fail to prove that any of the graffiti pertaining to Ian was written because the harasser sexually desired him, the harasser displayed hostility to the presence of Ian's sex in the workplace, or because the harasser believed that Ian did not conform to the stereotypes of his

25

gender. *See* Bibby, 260 F.3d at 262. In fact, we find Ian and Megan's candid deposition testimony, that the authors of the graffiti were either jealous or felt some animosity toward to Ian, to be indicative of what was likely the actual motivation behind the graffiti. (*See* Doc. 34 Ex. A-1 at 89:25-90:9; Ex. A-2 at 45:14-16). Also, we agree with Defendants that although the graffiti directed toward Plaintiffs included vulgar sexual content or connotations, such content, without more evidence that the graffiti was so pervasive as to create an intimidating, hostile, or offensive work environment, *see Andrews*, 895 at 1482, does not rise to the level of discrimination on the basis of sex that would offend Title VII.

As to the second element, the pervasiveness and regularity of the harassment, the Supreme Court in *Harris v. Forklift Systems, Incorporated* noted that in determining whether harassment was severe or pervasive, courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." 510 U.S. at 23; *see also Jensen v. Potter*, 435 F.3d 444, 452 (3d Cir. 2006) (finding that severe and pervasive harassment existed due to the "pounding regularity" of "retaliatory

insults two to three times per week for 19 months," physical threats, and property damage to the plaintiff's vehicle.).

While we previously found that such graffiti *could* alter the terms and conditions of employment, it was up to Plaintiffs at this, the summary judgment stage, to present sufficient evidence that the graffiti rose to the level of severe discrimination that altered the terms and conditions of employment.  Although we earlier found that the graffiti in this instance "is an inherently public display which is permanent until removed, and, when compared with the fleeting nature of offensive oral remarks, seems to this Court to be a more severe form of discrimination," it was nevertheless Plaintiffs' burden to prove that the graffiti was so severe and pervasive that it in fact altered the terms and conditions of Plaintiffs' respective employment.  Plaintiffs have failed to carry that burden.

In particular, although Megan knew of a single incident describing an illicit sexual relationship between her and her supervisor, it is notable that Megan never saw the graffiti for herself.  Furthermore, although we acknowledge Defendants' concession that graffiti in general is pervasive at NSR, we find that Megan's knowledge of one instance of sexually explicit graffiti, without even observing it firsthand, fails to satisfy the pervasive and regular element of this claim.  Ian likewise fails to demonstrate that the pervasiveness and severity of the graffiti

amounted to more than mere humiliating comments, which in and of themselves do not constitute severe or pervasive harassment. *See Hamera v. County of Bucks*, No. 06-3518, 2007 WL 2745772,, *3 (3d Cir. 2007).

Considering the totality of the circumstances, it appears that the graffiti appeared on at least four separate occasions between April 5, 2008 through March 11, 2009. (Doc. 27 ¶¶ 22, 33, 34; Doc. 33 ¶¶ 32, 40, 46, and 56). Although vulgar and humiliating, we fail to see how four separate incidents of graffiti reported over an almost one year period constitutes frequent harassment or discrimination. Moreover, although Plaintiffs maintain it was humiliating, they fail to allege that the alleged discrimination against either of the Plaintiffs involved physical threats, or, that the graffiti was more than merely offensive. *See Harris*, 510 U.S. at 23.

Regarding the third element, the detrimental affect of the discrimination on the employee, we find that although Plaintiffs contend that Megan suffered embarrassment and stress from her knowledge of the graffiti, Plaintiffs provide no evidence to support this assertion. We find the following portion of Megan's deposition testimony to be illustrative of Plaintiffs' failure to establish this element. Megan testified as follows:

> **Q:** Did the graffiti, itself, did that interfere with your ability to perform your job as a train dispatcher?
> **A:** No.

**Q:**    And the graffiti didn't interfere with your ability to succeed in becoming qualified on the various territories as a train dispatcher?

**A:**    No.

(Doc. 35 at 42 (citing Doc. 35 A-2 at 76:24-77:6)).  Similarly, Ian and Megan both fail to provide any evidence concerning the detrimental affect the graffiti had upon them, other than to allege that they were embarrassed or humiliated.  Furthermore, the conclusory allegations they provide in support of summary judgment fail to demonstrate that the graffiti unreasonably interfered with their work performance. *See Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000) (stating that the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial.").

As to the fourth element, whether a reasonable person would be detrimentally affected by the discrimination, the pervasiveness and regularity of graffiti of all types tends to establish that a reasonable train conductor in Ian's position would not have been detrimentally affected by the teasing, despite its crude and vulgar nature.  The deposition testimony of Stewart McGarvey illustrates how another person in Ian's position was affected by graffiti at the NSR train yards.  He stated "[t]here's not just graffiti about Ian, there's graffiti about other people. . . " and "if a train goes by, almost every car has graffiti on it."  (Doc.

29

34, Ex. A-7 at 24:22-25:3; 27:9-11).  We also find Petrewicz's statement, "guys have been writing [graffiti] about each other as long as I'm on the railroad . . . I've been on the walls," to illustrate how a reasonable train conductor in Ian's position may have been affected by the graffiti.  (*Id*., Ex. A-6 at 38:12-15).  Concerning Megan, we fail to see how a reasonable person would be detrimentally affected after learning of a single instance of offensive graffiti at a location a few miles away without ever observing it personally.  *See Abramson v. William Paterson College*, 260 F.3d 265, 280 (3d Cir. 2001) ("simple teasing, offhand comments, and [non-serious] isolated incidents . . . would not amount to discriminatory changes in the terms and conditions of employment.").

Finally, as to the fifth element, we note that "employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Huston v. P&G Paper Prods. Corp.*, 568 F.3d 100, 104 (M.D. Pa. 2009).  In *Griffin v. Harrisburg Property Services Incorporated* the Third Circuit stated:

> an employee's knowledge could be imputed [to the employer] where the employee is sufficiently senior in the employer's governing hierarchy, or otherwise in a position of administrative responsibility over employees under him, such as a departmental or plant manager, so that

30

such knowledge is important to the employee's general management duties.

2011 U.S. App. LEXIS 7011, at *9 (3d Cir., Apr. 4, 2011).

In the case *sub judice*, we find that NSR provided a reasonable avenue for complaint and that Plaintiffs availed themselves of these internal procedures pursuant to NSR's EEO policy.  As to the next question, whether NSR failed to take prompt and appropriate remedial action, we find that NSR's investigations, hearings, and disciplinary actions were all "reasonably calculated to end the harassment."  *Andreoli*, 482 F.3d at 644.  Both parties recognize that the anonymous nature of the graffiti required an initial investigation into the source thereof.  As a result, we find NSR's actions to have been prompt under the circumstances.

After Ian reported the graffiti to NSR management, the company performed an internal investigation that involved interviewing employees working near the location of the graffiti, photographing the graffiti, hiring an independent handwriting expert to analyze handwriting samples and compare them to the graffiti, and conducting an investigatory hearing.  (Doc. 33 ¶¶ 33-39; 41-45; 47-48; 49-51; 56-64).  NSR also reviewed with employees its EEO policy, specifically the provisions dealing with harassment, following each of Plaintiffs'

31

reports, and subsequently painted over the offending graffiti after the same was properly documented or photographed.  (*Id*.).  In addition, Petrewicz also addressed UTU members and instructed them to stop writing graffiti.  (Doc. 33 ¶ 34).

In determining whether NSR took prompt and appropriate remedial action, we find the Third Circuit's decision in *Austin v. Norfolk Southern Corporation* to be instructive.  2005 U.S. App. LEXIS 27298, at *7-8  (3d Cir., Dec. 14, 2005).  In that case, the court found that a jury could not reasonably conclude that the defendant employer failed to take corrective action when (1) supervisors met frequently with plaintiff; (2) the company posted notices regarding its sexual harassment policy; (3) the company interviewed employees plaintiff identified as suspects; (4) supervisors included sexual harassment training in its safety meetings; (5) the company inspected locomotives for graffiti and removed graffiti; and (6) the company asked local union representative to address graffiti with union's members.  We find the remedial action taken by Norfolk Southern Corporation in *Austin* to be strikingly similar to the steps taken in this case. Moreover, we reiterate that Plaintiffs have provided nothing but conclusory statements to support their contention that NSR's remedial actions were less than prompt.  Therefore, Plaintiffs have failed to carry their burden and demonstrate

that there is no genuine issue of material fact in support their motion for summary judgment.  On the other hand, Plaintiffs' same conclusory allegations likewise fail to raise a genuine issue of material fact in opposition to Defendants' motion for summary judgment.  Therefore, we shall grant Defendants' motion for summary judgment on both of Plaintiffs' hostile work environment claims.

### B.    Count II: Retaliation

Defendants also move for summary judgment on Count II of Plaintiffs' complaint, which alleges a claim for retaliation under Title VII.  (Doc. 1 at 8).  In support thereof, Defendants contend that following Ian's complaints concerning the graffiti, NSR legitimately disciplined him for multiple violations of company policy.  (Doc. 35 at 45).  They note that to prove a prima facie case of retaliation under Title VII and the PHRA, a plaintiff must prove the following: (1) he engaged in protected conduct; (2) an adverse action was taken; and (3) there is a casual link between the protected conduct and the adverse action.  (*Id*. at 46 (citing *Gladysiewski v. Allegheny Energy*, 398 Fed. Appx. 721, 723, 2010 WL 3622446, *2 (3d Cir. 2010))).  Defendants contend that Ian lacks the third element required to establish a prima facie case for retaliation.  They claim that Ian must establish that NSR treated similarly situated persons, not engaged in the protected activity,

more favorably than him.  (*Id*. at 46-47 (citing *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F.3d 639, 644-45 (3d Cir. 1998))).

In support of their contention, Defendants highlight the disciplinary actions taken against Ian.  First, they claim that Ian was disciplined after he accepted responsibility for posting graffiti on October 27, 2008 that stated "Dorson is gay." (*Id*. at 47).  Ian received thirty (30) days deferred suspension for this action. Defendants claim that in the Third Circuit, in order to establish a causal link between the protected activity and adverse employment action the temporal proximity between the two actions must be "unusually suggestive."  (*Id*. at 48 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000))).

The second disciplinary action against Ian occurred on December 8, 2008 as a result of a series of text messages exchanged between Ian and Ollie Hopkins. (*Id*.).  Defendants claim that on December 10, 2008, after Moore examined the exchange of messages, both men were charged with "conduct unbecoming an employee and making threatening remarks."  Following a hearing, Ian and Hopkins were found guilty of these charges and assessed thirty (30) days deferred suspension.  As a result of Ian's previous thirty (30) days deferred suspension, this incident triggered an actual suspension of sixty (60) days.  However, Defendants maintain that the sixty (60) day suspension followed from strict application of the

thirty (30) days deferred suspension's probationary period, and was not assessed against Ian in retaliation for reporting the sexual harassment.  (*Id.* at 49).  Thus, although Ian claims the second punishment of thirty (30) days deferred suspension was excessive, because other NSR employees who behaved similarly were not subject to such discipline, Defendants assert that Ian fails to identify similarly situated employees who were not assessed thirty (30) days deferred suspension for making threatening remarks. (*Id.*).

The incident resulting in Ian's third disciplinary action took place on July 31, 2009 when a supervisor at the Enola Yard observed Ian conducting a dangerous maneuver in a company vehicle.  (*Id.* at 51).  The supervisor witnessed Ian driving in reverse at a high rate of speed, thirty-six (36) miles per hour, for a prolonged distance.  When asked why he operated a company vehicle in this fashion, Ian responded, "because I am capable of doing so."  (*Id.* at 52). Defendants contend that NSR takes speeding seriously, and other eye witnesses testified that the charge against Ian was justified.  On August 7, 2009, a hearing was held concerning this incident and Ian was found guilty of "engaging in unsafe work practices" and was subsequently terminated from employment with NSR. (*Id.*).  Again, Defendants maintain that despite Ian's claim that the punishment was excessive, he fails to identify any other NSR employees who have been found

35

guilty of engaging in unsafe work practices but were not terminated from employment.  Thus, Defendants claim, Ian fails to prove that he was terminated in retaliation for reporting the graffiti.  (*Id*. at 52-53).

Alternatively, Defendants argue that were the Court to find that Ian has established a prima facie retaliation claim, Ian nevertheless fails to satisfy the second and third prongs of the *McDonnell Douglas* burden-shifting framework. (*Id*. at 53).  They note that the second prong of *McDonnell Douglas* requires the employer to "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."  (*Id*. (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003))).  Defendants note that Ian's acts of indiscretion at NSR clearly violated company policy and resulted in appropriate discipline for those actions. Moreover, they highlight that any discipline for Ian's actions came after a full investigation and hearing at which Ian had union representation, numerous witnesses testified, and a neutral Hearing Officer weighed the credibility of the evidence presented.  (*Id*. at 54).

Furthermore, Defendants contend that Ian fails to provide sufficient evidence to prove that Defendants' legitimate, non-discriminatory reason for his discipline was a pretext for discrimination.  (*Id*. at 54-55 (citing *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (noting that in refuting an employer's

36

legitimate, nondiscriminatory reasons, plaintiff must "demonstrate weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions."))).  To support this contention, they highlight the deposition testimony of Dave Zumbro, Jeff Moore, Don Craine, and Gary Petrewicz who testified to the legitimate, nondiscriminatory rationale for disciplining Ian.  (*Id*. at 55-56).  In addition to other NSR supervisors who testified similarly, Fennell provided the following:

> **Q:** Did Norfolk Southern decide to pursue disciplinary action against Ian with regard to any of these incidents we discussed because he had previously filed the graffiti complaint?
> **A:** Absolutely not.
> **Q:** . . . Are you aware of whether Norfolk Southern retaliates against employees who file workplace complaints?
> **A:**  Alright, Norfolk Southern has never retaliated.  We don't.  That's not a part of who we are.  And in this case specifically, there was no retaliation against Mr. Donaldson at any point in time.

(*Id*. at 56 (citing Doc. 34 Ex. A-5 at 46:21-47:25, 47:14-24)).

Defendants also cite the deposition testimony of Petrewicz, the union representative who defended Ian at both of his formal investigative hearings, who stated:

> **Q:** Do you think [Ian] was retaliated against by his co-workers for filing those complaints?
> **A:** No.

(*Id*. at 56-57 (citing Doc. 34 Ex. A-6 at 56:21-23)).

Thus, Defendants argue, the record evidence demonstrates that the disciplinary actions taken against Ian were caused by his own misconduct and were wholly unrelated to his reports of graffiti or the EEOC complaints filed by him and his wife.  (*Id*. at 57).

In opposing summary judgment, Plaintiffs contend that Ian was subjected to "relentless retaliation" from coworkers and supervisors at NSR, and that he was verbally and physically threatened for reporting the incidents of graffiti.  (Doc. 41 at 21).  As to the disciplinary action Ian received after the incident with Olli Hopkins, Megan testified that she heard similar or even more threatening remarks made by other management level employees who experienced no adverse employment action as a result of the same.  (*Id*. at 22).  In particular, Megan claims she observed Don Craine enter the dispatch office and say "where's Mike? If he left, I'll kill him.  I'll slit his throat."  (*Id*.).  Plaintiffs contend that Craine's statements did not result in any adverse employment action.

Similarly, Ian asserts he witnessed other employees driving company vehicles in reverse in the same manner he was driving, but without any adverse employment repercussions.  Plaintiffs also contend that Ian was retaliated against for following NSR policy and reporting a potential trespasser in a restricted area, who turned out to be an NSR supervisor.  (*Id*. at 23).  A Mr. McGarvey testified

38

that Ian would not have been "written up" for this violation if he had not reported a supervisor the day before for trespassing.  (*Id*.).

Here, we find that Plaintiffs fail to raise a genuine issue of material fact in opposition to Defendants' motion for summary judgment on Ian's retaliation claim.  In *Moore v. City of Philadelphia*, the Third Circuit stated:

> to establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.

461 F.3d 331, 340-41 (3d Cir. 2006).  As the parties do not contest that Plaintiffs were engaged in activity protected by Title VII, or that Ian suffered adverse employment action, it appears that the only element in dispute is whether there was a causal connection between Ian's participation in the protected activity and the adverse employment action he suffered.

Again, we find that Plaintiffs provide nothing to oppose summary judgment but conclusory statements contained in their pleadings and briefs.  *See Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985) (noting that arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."). Additionally, they fail to provide any evidence suggesting that the disciplinary

action taken against Ian was initiated in retaliation for his reports of the graffiti.  In

fact, as to each of the incidents for which Ian was disciplined he admitted to the

misconduct at issue, such as posting the "Dorson is gay" graffiti, the exchange of

text messages between himself and Ollie Hopkins, and driving a company vehicle

in reverse at a high rate of speed.  Thus, we find Ian's admissions to these

violations of NSR policy to contradict any allegation that NSR sought to retaliate

against him for reporting the graffiti when it disciplined and subsequently

terminated his employment with the company.

Accordingly, we find that Ian has failed to raise a genuine issue of material

fact concerning his failure to plead a prima facie retaliation claim.  Despite the fact

this finding is dispositive of Plaintiffs' retaliation claim, we note that even if we

had found that Ian established the requisite elements, Defendants' discipline of Ian

for misconduct that violated NSR policy constitutes a legitimate,

nondiscriminatory rationale for the adverse employment action.  Furthermore,

notwithstanding Megan's claim that she overheard an NSR employee make

threatening remarks without receiving punishment, and Ian's contention that other

employees drove company vehicles in reverse at high rates of speed without being

disciplined, we fail to see how such unsubstantiated allegations create

"weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions"

40

that negate, as mere pretext for retaliatory animus, Defendants' legitimate, nondiscriminatory rationale in disciplining Ian for conduct that violated NSR policy. *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (noting that in refuting an employer's legitimate, nondiscriminatory reasons, plaintiff must "demonstrate weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions.").

Therefore, we shall grant Defendants' motion for summary judgment on Plaintiffs' retaliation claim.

## IV.   CONCLUSION

It is readily apparent that rail yards, such as NSR's, can be tough places to work. Clearly, those who decide to earn a living there must develop thick skins, as the daily environment may feature rude, crude, and offensive behaviors of the types uncovered here. However, it is axiomatic that while these behaviors may be as gross as they are lamentable, they fail to support Plaintiffs' various claims.

For the reasons stated above, we shall deny Plaintiffs' Motion for Summary Judgment, (Doc. 26), and grant Defendants' Motion for Summary Judgment. (Doc. 32). An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IAN D. DONALDSON and | : | 10-cv-1556 |
| MEGAN DONALDSON | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| NORFOLK SOUTHERN RAILWAY, CO., | : | |
| and NORFOLK SOUTHERN CO., | : | |
| | : | |
| Defendants. | : | |

## ORDER

**August 15, 2011**

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' Motion for Summary Judgment (Doc. 26) is **DENIED**.

2. Defendants' Motion for Summary Judgment (Doc. 32) is

   **GRANTED**.

3. The clerk is instructed to **CLOSE** this case.


s/ John E. Jones III
John E. Jones III
United States District Judge

42